DANIEL J. CARREKER, administrator, plaintiff in error, *vs.* JOHN H. WALTON, defendant in error.

1. Property in this State is taxable according to its fair market value, and the owner of it cannot escape paying taxes thereon by ignoring all inquiry as to the true market value. If it has a value in fact, it is presumed to have market value, unless it be affirmatively shown that such is not the fact.

2. On the trial before a jury, under the Act of October 13th, 1870, as to whether the legal taxes upon a debt have been paid, the issue is not entirely what the tax payer thought or thinks, but whether the legal taxes have been in fact paid, according to the fair market value of the debt, for each year since the debt was contracted.

WARNER, Chief Justice, dissented.

Relief Act of 1870.    Tax affidavit.    Market value.    Before Judge JOHNSON.    Talbot Superior Court.    March Term, 1872.

John H. Walton brought complaint against Daniel J. Carreker, as administrator upon the estate of Lafayette T. Lockhart, deceased, on three promissory notes, dated September 12th, 1861, and due on December 25th, 1863, each for the sum of $778 25, with a credit upon one of said notes of $575 81, dated January 12th, 1867. The notes were made by Lafayette T. Lockhart, and indorsed by David Lockhart.

The defendant pleaded: 1st. The Scaling Ordinance of 1865. 2d. The Relief Act of 1868.

Upon the trial, plaintiff testified that he purchased the notes sued on from William Adams; that he paid all taxes chargeable on them, each and every year, up to 1865; that he did not give them in or pay taxes on them that year, as no taxes were received or collected; that since 1865, he had not given in or paid taxes on said notes, because he believed they had no

market value; that the maker and indorser of the notes reside in Talbot county; that he did not know the property they owned, or how much they were worth, and had never made inquiry to find out their condition or circumstances; that he could not say whether said notes would have brought $50 00 or $100 00 in market; that he never attempted to ascertain what they would have brought; that Lafayette Lockhart, on January 20th, 1868, paid plaintiff $1,516 00, which took up one note plaintiff then held amounting to $778 25, principal, and left a balance of $575 00, which was credited upon one of the notes in suit.

Plaintiff then introduced David Lockhart, who testified that he indorsed the notes in suit, at the instance and request of the maker; that the notes were given for land which Lafayette Lockhart purchased from the heirs-at-law of James Mason; that since the war, witness has been worth $15,000 00 or $20,000 00; that plaintiff would not take the notes when Adams offered to sell them to him, unless witness would indorse them.

Defendant introduced William Adams, who testified that the notes were given for land sold by the heirs-at-law of James Mason to Lafayette Lockhart; that the land was purchased for $9,000 00, and defendant's intestate paid about $6,000 00 in notes on persons in Sumter and Schley counties, and for the balance of the purchase money, gave four notes, each for the sum of $778 25; that witness traded the notes to plaintiff in 1862 or 1863; that Lockhart declined to purchase the land, unless the heirs agreed to receive payment in whatever might be the currency of the country when the notes fell due; that Lockhart sold the land to Samuel Baldwin, in February, 1867, for $4,500 00.

Defendant testified, that his intestate died in August, 1867, and, previous to his death, sold the "Mason place" for $4,-500 00; that Baldwin had paid the purchase money to defendant, and all of it had been paid towards the debts of his intestate, except about $1,300 00; that, in February, 1868, defendant proposed a compromise to plaintiff, who replied

that the notes were the only good ones that he had, and he could not accept less than the principal and interest; that he again proposed a compromise in 1871, and plaintiff declined to take less than the face of the notes; that, at the maturity of the notes, Confederate money was the only currency of the country.

Doctor ......... testified, that he was present when an offer of compromise was made by defendant to plaintiff in 1868; that plaintiff said that the notes were the only good ones he had, and he could not take less than the principal and interest.

Barber's Table was introduced, showing that on December 25th, 1863, the difference between gold and Confederate currency was twenty to one.

Defendant requested the Court to charge the jury as follows, to-wit: "If Walton refused to give in the notes for taxes, on the ground that he believed they had no market value, such belief must be a *bona fide* and intelligent belief, and not ignoring all inquiry as to the ability and solvency of the makers thereof;" which said charge the Court then and there refused to give, but, in place thereof, charged as follows: "That if Walton believed said notes had any value, then he was bound to give them in at their value, as estimated by himself. And again, if he, in good faith, believed that the notes had no market value, then he was not bound to return or give them in."

The jury returned a verdict for the plaintiff for the sum of $1,380 00, and defendant moved for a new trial, upon the following grounds, to-wit:

1st. Because the verdict was contrary to law.

2d. Because the verdict was strongly and decidedly against the weight of evidence.

3d. Because the evidence did not prove that plaintiff had given in and paid all legal taxes chargeable by law on the notes sued on.

4th. Because the Court erred in refusing to charge as requested, and in the charge as given.

The motion for a new trial was overruled by the Court, and

Carreker *vs.* Walton.

plaintiff in error excepted and assigns said ruling as error upon each of the aforesaid grounds.

E. H. WORRILL; WILLIS & WILLIS; N. J. HAMMOND, for plaintiff in error.

M. H. BLANDFORD; G. N. FORBES, for defendant.

McCAY, Judge.

In the case of *Irvin vs. Turner* at this term, we decided that property, including debts, is taxable in Georgia according to its value. The machinery by which this value is ascertained is, in ordinary cases, the oath of the tax-payer. But this is not and ought not to be conclusive. The State may take any other mode it sees fit to arrive at the truth. The Act of 1870 requires the affidavit of all legal taxes paid, and proof at the trial of the truth. The evidence in this case is a strong commentary on the propriety of some mode of checking the prevalent indisposition to give in and pay tax on property which is easily hidden. This note was not given in at all, and the owner of it says, in open Court, he did not know it had any value. And this in face of the fact that he refused to settle it except for its full amount, and in face of plenty of other evidence within his knowledge that it had considerable value. Men have no right to ignore the truth; to refuse to inquire; to shut their eyes to patent facts; and, if they do so, they ought to suffer for it. As we said in *Irvin vs. Turner*, the issue before the jury was: "Have the taxes been paid?" Not the tax at the value thought, or pretended to be thought, by the tax-payer, but the true value—the market value—the value other people put upon it—the value the tax payer will take for it. This is to be ascertained—fairly and truly. If the jury only differ in a small matter from the return, they ought to agree with it. Since the tax payer ordinarily has the best means of knowing the value of his own property, and if he acts in good faith, common justice would indicate that he has given it in at its true value. But it is very suspicious to

find one pressing a note by suit which he has not given in at all, because it has no value. Men do not usually throw away time and money in law suits, when they think the thing in litigation is valueless. And the proof in this case shows pretty conclusively that the worthlessness of the note, even in the mind of the tax payer, is pretense.

We think the charge of the Court was error. The belief of the tax payer is not conclusive, and to have any value it ought to be a belief founded on a proper consideration of the facts. He cannot ignore patent facts, and refuse or fail to inform himself. Such a rule would justify one owning land he did not want to sell, in not giving it in. How many men are there who have never made any inquiries as to what their land will sell for? And yet they are bound to pay taxes on its market value. They are in duty bound to find out in some way its value, and to pay tax on that value, and we give very little heed to the pretended want of knowledge. If a man had appeared wanting to buy, we feel sure even this plaintiff would have known the value of the only good notes he had, and notes, too, on which he had already received money.

Judgment reversed.

MONTGOMERY, Judge, concurred, and WARREN, Chief Justice, dissented, but furnished no opinions.